IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| CALEB BASSETT, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 3:21-cv-152 |
| | ) | Judge Katherine A. Crytzer |
| HERBERT SLATERY, et al., | ) | Magistrate Judge Debra C. Poplin |
| | ) | |
| Defendants. | ) | |

## PLAITIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' COMPLAINT

Plaintiffs Caleb Bassett, Blake Beeler, Logan Ogle, and Firearms Policy Coalition, Inc. oppose Defendants' Motion to the Dismiss Plaintiffs' Complaint ("MTD" or "Motion"). Defendants' claims in support of the Motion are baseless and serve only to highlight the strength of Plaintiffs' Complaint as pleading a clear and compelling case that the challenged laws must be declared unconstitutional under the Second Amendment and accordingly enjoined.

### I. Standard of Review

"In reviewing a motion to dismiss, we construe the complaint in the light most favorable to the plaintiff, draw all reasonable inferences in its favor, and accept all well-pleaded allegations in the complaint as true." *Keene Group, Inc. v. City of Cincinnati*, 998 F.3d 306, 310 (6th Cir. 2021). "This analysis focuses on 'the allegations in the complaint, although matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint, also may be taken into account.'" *Id.* (internal quotations omitted). The essential question is "whether the complaint contains 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Solo v. United Parcel Service Co.*, 819 F.3d 788, 793 (6th Cir.

1

2016) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (quoting *Ashcroft*, 556 U.S. at 678). "This standard 'does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct].'" *Id.* at 793-94 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

## II. Factual and Procedural Summary

The challenged Tennessee laws generally ban all 18-to-20-year-olds from carrying loaded handguns, openly or concealed, anywhere on "public streets or public property," as Defendants themselves put it. MTD 9-10 (citing the general prohibitions and exemptions at issue, i.e., Tenn. Code Ann. §§ 39-17-1307(a)(1), 39-17-1307(a)(2)(A-C), 39-1308(a)(1)—(a)(11), 39-17-1315, 39-17-1351, 39-17-1366). As Defendants also acknowledge, the State's new "permitless" carry scheme continues to broadly exclude this class of individuals, based solely on their age and without regard to one's status as a law-abiding citizen otherwise fully entitled to exercise the Second Amendment right to keep and bear arms for self-defense and other lawful purposes. MTD 5 ("Tennessee's statutory scheme operates to bar 18-to-20-year-olds from permitless carry of handguns and from obtaining a permit if they are not past or present members of the military.").

Plaintiffs Bassett, Beeler, and Ogle are all law-abiding young adults with no history of violent behavior or other conduct posing a risk to public safety, who are otherwise fully entitled to carry loaded handguns in public for self-defense and other lawful purposes in the exercise of their Second Amendment right to keep and bear arms, and who would do so in the exercise of that right but for the criminal prohibitions imposed against them by the challenged laws solely because they are under the age of 21 and do not qualify for any of the narrow exemptions. Cmplt ¶¶ 7-8, 12-15,

2

19, 21-24, 40, 43, 45-54, 56, 59, 61-64, 66-70, 72, 75, 77-86, 101-105. They bring this action on behalf of all similarly situated individuals subject to criminal prosecution for any attempt to exercise this right in violation of the challenged laws and they seek relief declaring and enjoining the laws as unconstitutional. Cmplt ¶¶ 8, 12-15, 19, 21, 37, 47-48, 63-64, 79-80, 102-105; Prayer.

Plaintiff Firearms Policy Coalition ("FPC") is a non-profit entity organized around the central purpose of defending and advancing citizens' fundamental constitutional rights, especially the individual rights secured under Second Amendment and, in particular here, the Second Amendment rights of the individual plaintiffs in this case and all other similarly situated FPC members and supporters who are subject to the challenged laws. Cmplt ¶ 25. Plaintiff FPC brings this action on behalf of all such adversely affected individual members and similarly situated members of the public, thus seeking the same relief as the individual Plaintiffs. Cmplt ¶¶ 94-95.

### III. The Fundamental Rights At Stake

As the Second Amendment plainly provides, "the right *of the people* to keep and bear arms shall not be infringed." U.S. Const., amend. II (emphasis added). This right "guarantee[s] the individual right to possess and carry" firearms, *District of Columbia v. Heller,* 554 U.S. 570, 592 (2008), and specifically the right to "wear, bear, or carry ... upon the person or in the clothing or in a pocket, for the purpose ... of being armed and ready for offensive or defensive action in a case of conflict with another person," *id.* at 584. As the Supreme Court has made clear, this fundamental right secures *the people's* ability to carry and use *a handgun*—"the quintessential" and "most preferred" self-defense firearm in the United States, *id.* at 628-29; *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010)—for these purposes, a right which necessarily extends to carrying in public outside the home given those purposes, *Moore v. Madigan*, 702 F.3d 933, 937 (7th Cir. 2012) ("To confine the right to be armed to the home is to divorce the Second Amendment from

the right of self-defense described in *Heller* and *McDonald*."); *Wrenn v. District of Columbia*, 864 F.3d 650, 658 (D.C. Cir. 2017) (quoting *Heller*, 554 U.S. at 592) (emphasis in *Wrenn*) ("in the Court's own words," the right must include, "the 'right to possess *and carry* weapons in case of confrontation.'"). It is equally clear that this right and all its permeations extends to *all* law-abiding adults, including all 18-to-20-year-olds, just the same as it extends to those 21 or older.

## A.    The Second Amendment Categorically Protects 18-to-20-Year-Olds

The nature and scope of the rights secured under the Second Amendment today are defined by its original meaning in the Bill of Rights at the time of ratification. *Heller*, 554 U.S. at 598-599, 600-01, 627 (focusing on the meaning of the amendment's text at the time of its ratification); *McDonald*, 561 U.S. at 768-69 (same); *id.* at 811-56 (Thomas, J., concurring) (same). The Sixth Circuit itself has recognized this fundamental principle. *Tyler v. Hillsdale County Sheriff's Department*, 837 F.3d 678, 688 (6th Cir. 2016) (quoting *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012) (the amendment should be construed in '"terms of the right as publicly understood when the Bill of Rights was ratified"'); *Stimmel v. Sessions*, 879 F.3d 198, 204 (6th Cir. 2018) (quoting *Greeno* at 518) ("we consider 'the scope of the Second Amendment right[ ] as historically understood"'); *Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco & Explosives (BAFTE)*, 5 F.4th 407, 418 (4th Cir. 2021) (internal quotations omitted) ("we ask whether the conduct at issue was understood to be within the scope of the right *at the time of ratification*").

As the Sixth Circuit has also recognized, it is the government who bears the burden on this point: "the government must 'conclusively demonstrate that the challenged statute burdens persons historically understood to be unprotected' by the Amendment." *Stimmel*, 879 F.3d at 204 (quoting *Tyler*, 837 F.3d at 688); *Hirschfeld*, 5 F.4th at 418 ("The government bears the burden to show that the regulation clearly falls outside the scope of the Second Amendment."). It cannot carry this

4

burden here because the relevant historical record undoubtedly shows that the rights secured under the Second Amendment fully extend to 18-to-20-year-olds, both generally as being among "the people" and specifically as being among "the militia" for whom the rights are expressly protected.

Again, the operative clause of the Second Amendment declares that "the right of *the people* to keep and bear arms, shall not be infringed." Through its extensive analysis of the amendment's text in *Heller*, the Supreme Court concluded that the following interpretation "perfectly captured the way in which the operative clause of the Second Amendment furthers the purpose announced in the prefatory clause":

> 'The right of the whole people, *old and young*, men, *women and boys*, and *not militia only*, to keep and bear arms of every description, and not such merely as are used by the militia, shall not be infringed, curtailed, or broken in upon, in the smallest degree; and all this for the important end to be attained: the rearing up and qualifying a well-regulated militia, so vitally necessary to the security of a free State.'

*Heller*, 554 U.S. at 612-13 (quoting *Nunn v. State*, 1 Ga. 243, 251 (1846)) (italics added). Similarly, the court explained in no uncertain terms that the Second Amendment right presumptively "belongs to *all* Americans," and to "*all* members of the political community, not an unspecified subset." *Id.* 580, 581, 592 (italics added); *Stimmel*, 879 F.3d at 204-05 ("*Heller* conclusively established [that] the Second Amendment applies to law-abiding and peaceable citizens at the very least.") As members of our society with the right to vote, serve on a jury, hold public office, join or be drafted into the military and militia services, marry, and sign legally binding contracts, among many other rights, those 18-to-20-years-old unquestionably are, and always have been, "members of the political community" and thus categorically protected in this very sense.

Scholarly publications have reached the same conclusion based on the Second Amendment's text, which expressly includes "the people" as well as "the militia," and the relevant historical record of firearms laws. *See e.g.*, David B. Kopel & Joseph G.S. Greenlee, *The Second*

5

*Amendment Rights of Young Adults*, 43 S. Ill. U. L.J. 495, 573–577, 587 (2019) (detailing how arms carrying was not only a right available to, but an expectation or requirement of, all peaceable citizens at the time of the founding, based on numerous statutes requiring arms carrying by members of the general public to travel, work in the fields, work on roads and bridges, attend church, and attend court); Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 WYO. L. REV. 249 (2020) (historical analysis demonstrating that these rights and expectations existed for all law-abiding citizens, including 18-to-20-year-olds, and were traditionally only restricted for demonstrably dangerous and violent citizens).

The Fourth Circuit's recent opinion in *Hirschfeld*, which struck down federal firearm restrictions on 18-to-20-year-olds that were based solely on their age, includes an extensive and compelling analysis of the same question and reaches the same conclusion. As the court explained, while "a line must sometimes be drawn" in the law, "there must be a reason why constitutional rights cannot be enjoyed until a certain age." *Hirschfeld*, 5 F.4th at 410. "Our nation's most cherished constitutional rights vest no later than 18. And the Second Amendment's right to keep and bear arms is no different." *Id.* "Looking through this historical lens to the text and structure of the Constitution reveals that 18- to 20-year-olds have Second Amendment rights." *Id.* at 421. A multitude of reasons based on "the text and structure of the Second Amendment, along with its place within the Constitution as a whole," make it obvious that 18-to-20-year-olds are protected:

> First, nothing in the text of the Second Amendment limits its application by age. Second, the most analogous rights to the Second Amendment, those in the First and Fourth Amendments, similarly contain no age limits. Third, most other constitutional rights are not age limited. And fourth, the few rights that may not apply to those under 18 or that change by age are not analogous to the Second Amendment, and most of those rights become applicable at age 18, not 21.

*Id.* at 421.

"There are many things that minors and even those under 21 cannot do," like driving for hire, buying tobacco, and gambling for money. *Hirschfeld*, 5 F.4th at 424. "But none of those restrictions implicate constitutional rights, so states have great leeway to regulate those activities under their general police powers." *Id.* "Like most other *constitutional* rights, the Second Amendment has no explicit age limit, and the most analogous constitutional rights apply equally to everyone." *Id.* at 440 (italics added). "And when a constitutional right applies differently to minors, the age cutoff has consistently been set at 18, not 21," like voting rights. *Id.* at 423, 440.

Moreover, the Second Amendment expressly protects all who are and have been qualified for militia services, and "[t]hose over 18 were universally required to be part of the militia near the ratification, proving that they were considered part of 'the people' who enjoyed Second Amendment rights." *Hirschfeld*, 5 F.4th at 452. The *Heller* court itself made that clear, in explaining the militia consists of "all able-bodied men," "Congress has plenary power to organize … an effective fighting force" "from that pool" of "able-bodied men," and "[t]hat is what Congress did in the first Militia Act" by organizing able-bodied men between 18 and 45. *Heller*, 554 U.S. at 596. Indeed, all nine Justices in *Heller* agreed that individual militiamen are protected by the Second Amendment. The only disagreement among them was whether the right extends beyond the militia, with the majority holding that it does. Thus, while the Second Amendment's express protection of the militia is not *necessary* to reach the conclusion, because 18-to-20-year-olds are afforded the same general protections as their 21-and-older counterparts, it is nevertheless *sufficient* alone to establish that this fundamental right fully extends to them. *See Hirschfeld* at 427 ("Those excluded from the militia were not excluded from the Second Amendment, but those included in the militia were surely covered by the Second Amendment.").

7

While governments or judges may seek to strike "a different balance long after ratification" by restricting the exercise of the right to keep and bear arms among 18-to-20-year-olds based solely on their age, "that role is foreclosed to us by the balance that the Founders chose. We cannot now second-guess or undermine their choice." *Hirschfeld*, 5 F.4th at 452. "History makes clear that 18- to 20-year-olds were understood to fall under the Second Amendment's protections." *Id.*

## B. The Relevant Historical Record Demonstrates that 18-to-20-Year-Olds Always Have Been and Must Always Continue to be Deemed Categorically Protected Individuals

Naturally, given the reality that 18-to-20-year-olds were not only permitted but most often required to carry firearms, in public, throughout the colonial and founding eras, the historical record from this period is bereft of restraints on this group based merely on their age. "At the time of ratification, there were no laws restricting minors' possession or purchase of firearms. Most laws affecting minors post-date the Civil War, and the only two states (Alabama and Tennessee) to pass such laws before the Civil War did so immediately before the war (over 60 years after ratification)." *Hirschfeld*, 5 F.4th at 439. "These laws from later time periods provide little insight into the Amendment's original public meaning." *Id.* "And these laws were passed by states that were not bound by the Second Amendment." *Id.* at 440. "It would also be strange to rely on two southern laws restricting gun rights that were enacted before the Civil War given Congress's grave concerns about southern states disarming freed Blacks during this period." *Id.* "State laws passed decades after the ratification restricting gun ownership—at a time when state laws were used to disarm disfavored groups—is weak evidence of the original scope of the Second Amendment." *Id.*

The district court's opinion in *Lara v. Evanchick*, __ F.Supp.3d __, 2021 WL 1432802 (W.D. Pa. 2021), which nevertheless upheld Pennsylvania's age-based carry restrictions constitutional as "presumptively lawful regulatory measures," largely relied on the same list of cases that Defendants cite for support in this case: *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of*

8

*Alcohol, Tobacco, Firearms, and Explosives (BATFE)*, 700 F.3d 185 (5th Cir. 2012); *Nat'l Rifle Ass'n of Am., Inc. v. McCraw,* 719 F.3d 338, 342 (5th Cir. 2013), which followed the rationale in *BATFE* as binding law of the circuit; *Powell v. Thompkins*, 926 F.Supp.2d 367 (D. Mass. 2013); *Mitchell v. Atkins*, 483 F.Supp.3d 985 (W.D. Wash. 2020); and *Jones v. Becerra*, 498 F.Supp.3d 1317 (S.D. Cal. 2020). MTD at 8-10. All these opinions rest on fundamentally flawed analyses.

*Lara* highlights how the Fifth Circuit has erroneously construed *Heller's* exception for "presumptively lawful regulatory measures" by framing it *disjunctively*—i.e., as if it applies to *either* "longstanding" *or* "presumptively lawful" measures. *Lara*, 2021 WL 1432802 at *8 (citing *BATFE*, 700 F.3d at 196). As the Fourth Circuit astutely explained, "the word 'longstanding' in *Heller* [is not] a standalone exception to the Second Amendment." *Hirschfeld*, 5 F.4th at 418. Such a "novel view" conflicts with the text of *Heller*, which "makes clear that 'longstanding' serves as a modifier of part or all of the sentence, not as a freestanding category." *Id.* "*Heller*'s historical, textual, and structural analysis counsels against creating a freestanding category of laws exempt from Second Amendment scrutiny based solely on how long similar laws have existed." *Id.* Rather, the law must "be both a commercial condition *and* longstanding to be presumptively valid." *Id*.

*Lara* also highlights how the Fifth Circuit's analysis conflicts with the teachings of *Heller* by focusing on *post*-founding era evidence as support for age-based restrictions. *Lara*, 2021 WL 1432802 at *8 (quoting *BATFE*, 700 F.3d at 196) ("'a regulation can be deemed 'longstanding' even if it cannot boast a precise founding-era analogue'"); *id.* at *12 (subscribing to the Fifth Circuit's rationale that it is appropriate to even consider laws "only decades old"). Under this rationale, any restraint "that has been accepted by the public" for a "long" time would fall outside the purview of the Second Amendment, even if that "acceptance" occurred many years beyond the time of the ratification. *Id.* at *8, *12. Again, as the Sixth Circuit itself recognizes, staying true to

*Heller* here means the historical record at time of the ratification (1791) remains paramount in defining the Second Amendment protections. *Tyler*, 837 F.3d at 688; *see also Gamble v. United States*, 139 S.Ct. 1960, 1975-76 (noting that the *Heller* Court only looked to post-ratification treatises for "mere confirmation" of what it already concluded based on the evidence contemporaneous with the ratification); *Hirschfeld*, 5 F.4th at 437 (rejecting the primary source for the government's claim that 18-to-20-year-olds were historically restricted from purchasing firearms because the source "comes long after ratification, does nothing to support its case").

*Lara* further relied on another fundamentally flawed premise of the Fifth Circuit: it reasoned that 18-to-20-year-olds *could have* been restricted during the founding era because the term "minor" included all people under age 21, and thus, "'*[i]f* a representative citizen of the founding era conceived of a 'minor' as an individual who was unworthy of the Second Amendment guarantee,'" *then* the citizens "'*would have* supported restricting an 18-to-20-year-old's right to keep and bear arms.'" *Lara*, 2021 WL 1432802 at *8 (quoting *BATFE*, 700 F.3d at 8) (emphasis added). Positing the *hypothetical* scenario that such individuals *could have* been treated as "unworthy" of Second Amendment protection doesn't cut it, especially when everything in the relevant historical record shows 18-to-20-year-olds were *not* subject to constraints on their possession or purchase of firearms and no such constraints existed until many years later. "[E]ven so, constitutional rights were not generally tied to an age of majority, as the First and Fourth Amendments applied to minors at the Founding as they do today." *Hirschfeld*, 5 F.4th at 435.

Defendants' related argument that the Second Amendment has only ever protected "'law-abiding, *responsible* citizens' and 'persons under 21 tend to be irresponsible and emotionally immature, and can be thrill-bent and prone to criminal behavior,'" MTD 13 (quoting *McCraw*, 719 F.3d at 347-48), is similarly spurious. There is simply no evidence that law-abiding 18-to-20-year-

10

olds were ever historically subjected to such restraints based on a mere supposition of irresponsibility; everything in the relevant record points to the opposite conclusion. Indeed, the government's reasoning rests on the untenable notion that "the same 18-to-20 year-old men and women we depend on to protect us in the armed forces and who have since our Founding been trusted with the most sophisticated weaponry should nonetheless be prevented from [carrying loaded handguns for self-defense and other lawful purposes in public]" can simply be "read out of 'the people' in the Second Amendment." *Hirschfeld*, 5 F.4th at 446-47.

The district court in the *Powell* case, like the Fifth Circuit, relied on a host of age-based restrictions enacted long after the ratification of the Bill of Rights, beginning in the late nineteenth century and running up to the present time. *Powell*, 926 F.Supp.3d at 386-87. The court also suspiciously relied on "the xenophobic and bigoted" laws denying the firearm rights of non-White citizens during the slavery period as general evidence that "classification-based limitations on access to firearms for the purpose of ensuring public safety were commonplace in the early republic." *Id.* at 387. And, ultimately, the court rested its analysis on the same flawed rationale of the Fifth Circuit. *Id.* at 385 n. 15 ("this Court relies upon the Fifth Circuit's detailed decisional analysis as a model, and by virtue of this dependence, treads some of the same ground").

Similarly, the *Mitchell* opinion erroneously indulges in the existence of age-based constraints enacted decades—centuries, in fact—after the ratification and the spurious notion that such constraints can be considered sufficiently "longstanding" and/or "presumptively lawful" because, "[f]or most of our country's history," people under 21 have been considered "minors" "without the full legal rights of adulthood." *Mitchell*, 483 F.Supp.3d at 989-993. As already detailed, this rationale fails to acknowledge that we are dealing with *constitutional* rights (not the

11

ability to consume alcohol or gamble in casinos) which have been historically recognized as fully and equally extending to all law-abiding young adults, including 18-to-20-year-olds.

And the *Jones* case simply followed suit, relying on similarly flawed analytical frameworks and other cases that fundamentally misconstrue or misapply the teachings of *Heller*, like the *BATFE* opinion, to uphold age-based constraints on the rights of 18-to-20-year-olds. *Jones*, 498 F.Supp.3d at 1321-23. Like the Fifth Circuit, the court in *Jones* misconstrued the "presumptively lawful regulatory measures" exception as if "longstanding" is alone enough. *Id.* at 1325 (stating that this requires a court to "assess whether the regulation is longstanding *and thus* presumptively lawful"). It also relied on the rationale of *BATFE* and *Mitchell* that permits a court to rest its conclusion on modern laws and regulations far removed in time from the ratification. *Id.* at 1326. Lastly, the opinion places stock in the notion that 18-to-20-year-olds can be properly subject to age-based firearm restrictions because they are "minors," citing restrictions on renting cars and buying alcohol as supposedly analogous when, again, this rationale is untethered from any specific restraints on these *constitutional* rights of such individuals in the relevant historical record.[1]

So, *Lara*, the case on which Defendants principally rely here, is flat-out wrong in declaring as a pillar of its analysis, just like Defendants do, that the "established," "broad," or "strong" "consensus" among the judiciary "around the country is that age-based restrictions limiting the rights of 18-to-20-year-old adults to keep and bear arms fall under the 'longstanding' and 'presumptively lawful' measures recognized by the Supreme Court in *Heller* as evading Second Amendment scrutiny," *Lara*, 2021 WL 1432802 at *10-12—particularly in light of the Fourth Circuit's cogent analysis in *Hirschfeld* which compellingly demonstrates that any such conclusion directly conflicts with the controlling constitutional rubric under *Heller* and *McDonald*.

---

[1]  And this case is on appeal. *Jones v. Becerra*, Case No. 20-56174 (9th Cir. Nov. 9, 2020).

## IV.   The Challenged Laws Are Categorically Unconstitutional

In both *Heller* and *McDonald*, the Court "expressly rejected the argument that the scope of the Second Amendment right should be determined by judicial interest balancing." *McDonald*, 561 U.S. at 785; *see also Heller*, 554 U.S. at 634. Instead, these seminal cases demonstrate that three fundamental interpretative sources drive the analysis of restrictions upon rights secured under the Second Amendment: (1) the text of the amendment, particularly the relation between its prefatory and operative clauses, *Heller* at 576–600; (2) the original public meaning, *id.* at 634–35, *Tyler*, 837 F.3d at 710 (Sutton, J., concurring in most of the judgment) (quoting *Heller* at 635) ("What determines the scope of the right to bear arms are the 'historical justifications' that gave birth to it. . . . Tiers of review have nothing to do with it."); and (3) post-ratification history insofar as it may also shed light on the general tradition and public understanding of the rights involved in 1791, *Heller* at 605, although the original meaning at the time of ratification controls to the extent of any inconsistency, *see Gamble v. United States*, 139 S.Ct. at 1975-76 (the *Heller* Court only looked to post-ratification treatises for "mere confirmation" of what it had already concluded based on a wealth of evidence concerning the amendment contemporaneous with the ratification).

As outlined above, these factors all demonstrate that all law-abiding adults, including 18-to-20-year-olds, not otherwise subject to a disability (like a felony conviction) are entitled to exercise the full panoply of rights secured under the Second Amendment, and thus cannot be barred from carrying a loaded handgun in public, particularly not on pain of criminal sanction—period. Any attempt to strike "a different balance long after ratification" with laws restricting the exercise of these rights among 18-to-20-year-olds based solely on their age is "foreclosed to us by the balance that the Founders chose." *Hirschfeld*, 5 F.4th at 452. "We cannot now second-guess or

13

undermine their choice." *Id.* It follows that Tennessee's attempt do so through the criminal proscriptions at issue must be struck down as unconstitutional; end of story.

## V.  The Challenged Laws Are Unconstitutional Under Any Form of Heightened Scrutiny

As outlined above, an interest-balancing analysis is neither necessary nor appropriate in reaching the conclusion that we must here. *See Tyler*, 837 F.3d at 703 (Batchelder, J., concurring in most of the judgment) (Both *Heller* and *McDonald* "put the historical inquiry at the center of the analysis," both "conspicuously refrain from engaging in anything resembling heightened scrutiny review," and both "indicate strongly that standards of scrutiny are just shorthand for unguided interest balancing" which is prohibited). Further, it is clear that "possession and carrying are on par with each other" in terms of Second Amendment protection, *Wrenn*, 864 F.3d at 664, so any law that completely prohibits a class of people from exercising their right to bear arms in public should be subject to the same categorical treatment to which the prohibition on possession at issue in *Heller* was subject. Nevertheless, the challenged laws are plainly unconstitutional even under the most lenient version of the "two-step inquiry" designed to weigh the interests of the State against the interests of the individuals targeted by the laws.

## A.  The State Bears a "Demanding" Burden Under Heightened Scrutiny

Under this two-step test, the government first "must show 'that the challenged statute regulates activity falling outside the scope of the Second Amendment right as it was understood at the relevant historical moment.'" *Stimmel*, 879 F.3d at 204 (quoting *Greeno*, 679 F.3d at 518). The government fails to carry its burden if its historical evidence is either "inconclusive or suggests that the regulated activity is *not* categorically unprotected,'" in which case the analysis proceeds to the second step. *Id.* (quoting *Greeno* at 518). That is the case here, as all the relevant evidence makes clear the regulated activity *is* categorically protected. Thus, at the second step, the court

Case 3:21-cv-00152-KAC-DCP   Document 20   Filed 09/13/21   Page 14 of 25   PageID #: 130

"must inquire 'into the strength of the government's justification for restricting or regulating the exercise of Second Amendment rights.'" *Id.* (quoting *Greeno* at 518). "Under this second prong, we determine and apply the appropriate level of heightened means-end scrutiny, given that the Supreme Court has rejected rational-basis review in this context." *Id.*

"Laws imposing 'severe burdens on plaintiffs' rights' are subject to strict scrutiny," while "'lesser burdens ... trigger less exacting review.'" *Schmitt v. LaRose*, 933 F.3d 628, 639 (6th Cir. 2019) (quoting *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997)). "Laws subject to strict scrutiny are presumptively unconstitutional and can only survive if they (1) serve a compelling state interest and (2) are narrowly tailored to achieve that interest." *Susan B. Anthony List v. Driehaus*, 814 F.3d 466, 473 (6th Cir. 2016). Similarly, for "intermediate scrutiny," while the law need not be the *least* restrictive means of advancing a "significant" or "important" governmental interest, it must be "narrowly tailored" to achieve that interest. The Supreme Court has repeatedly said this. *See e.g.*, *Packingham v. North Carolina*, 137 S. Ct. 1730, 1736 (2017) (the government must show that the law is "narrowly tailored to serve a significant governmental interest"); *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (same); *F.C.C. v. League of Women Voters of California*, 468 U.S. 364, 380 (1984) (same). So have courts in the Sixth Circuit. *See e.g.*, *Phelps-Roper v. Strickland*, 539 F.3d 356, 370 (6th Cir. 2008) (quoting *Madsen v. Women's Healthcare Center*, 512 U.S. 753, 765 (1994)) (Although not as stringent, to survive intermediate scrutiny, the law also "must be 'narrowly tailored to serve a significant governmental interest.'"); *Project Veritas v. Ohio Election Comm.*, 418 F.Supp.3d 232, 263 (S.D. Ohio 2019) (same); *CH Royal Oak, LLC v. Whitmer*, 472 F.Supp.3d 410, 415 (W.D. Mich. 2020) (same).[2]

---

[2]     While these cases deal with restraints imposed on First Amendment rights, it is clear that First Amendment jurisprudence is a proper analogue for analyzing restraints on the Second Amendment. *See Heller*, 554 U.S. at 582, 591, 595, 606, 625-26, 635 (analogizing to the First

The burden of justifying a restraint under heightened scrutiny "is demanding and remains with the government. Under intermediate scrutiny, the government must state a 'significant, substantial, or important' objective and establish 'a reasonable fit' between the challenged restriction and that objective." *Stimmel*, 879 F.3d at 207 (quoting *Tyler*, 837 F.3d at 693). It must prove the scope "is in proportion to the interest served." *Id.* While "'case law, and even common sense' may be relied on, the government may not 'rely upon mere 'anecdote and supposition.'" *Tyler* at 694 (quoting *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 822 (2000)). "The government must therefore offer more than speculation to connect a ban on 18- to 20- year-olds [from carrying loaded handguns in public] to a substantial interest." *Hirschfeld*, 5 F.4th at 440.

## B. Defendants' Baseless Justifications Highlight the Unconstitutionality of Their Laws

In fashioning their defense of this restraint, Defendants pursue a two-fold strategy. First, they portray themselves as having weighty "interests in public safety and crime reduction," particularly in light of what they claim to be "indisputable statistical evidence showing the disproportionate rate at which 18-to-20-year-olds commit violent crimes and are armed during the commission of such a crime." MTD 2, 5-6, 7, 15. Second, Defendants portray the burden imposed on these individuals as relatively "limited" because of "several carveouts that allow 18-to-20-year-olds to possess and use firearms." MTD 5, 14. All this, Defendants claim, adds up to a "reasonable fit" sufficient to survive intermediate scrutiny. MTD 16. Given the severe burden imposed by the

---

Amendment in explaining the framework for properly analyzing the constitutionality of restraints on Second Amendment rights); *McDonald*, 561 U.S. at 759, 779, 782 (analogizing to the First Amendment in explaining the basis of the Second Amendment's incorporation against the states); *U.S. v. Marzzarella*, 614 F.3d 85, 89 n. 4 (3d Cir. 2010) (the Supreme Court's significant reliance on First Amendment jurisprudence means "the structure of First Amendment doctrine should inform our analysis of the Second Amendment"); *see also United States v. Miller*, 604 F.Supp.2d 1162, 1165 (W.D. Tenn. 2009) (noting that *Heller* analogized to the First and Fourth Amendments in analyzing the constitutionality of restraints on the rights secured under the Second Amendment).

challenged laws—a general ban on the exercise of these individuals' fundamental rights which are categorically protected under the Second Amendment—strict scrutiny is the only appropriate measure in any interest-balancing analysis. *See Schmitt*, 933 F.3d at 639. But Defendants' purported justifications fail miserably even under the standards of intermediate scrutiny.

1. **Defendants' Purported Evidence and Comparative Analyses Serve Only to Prove that No Legitimate Justification Exists to Support the Challenged Laws**

The sole evidence Defendants proffer in support of their claims is a (1) 24-year-old study conducted in 1997 indicating that 22 percent of those *arrested for homicide* were 19 to 20 years of age and, of those who *committed homicides* at that time, most were 18, David Sheppard, et al., *Fighting Juvenile Gun Violence*, U.S. Dept. of Justice Juvenile Justice Bulletin (Sept. 2000) (MTD, Ex. A); and (2) a 20-year-old survey of *convicted felons in prison* conducted in 2001, in which 35.5% of the felons in state prison and 23% of the felons in federal prison self-reported having "possessed a firearm during their convicting offense," "a greater portion" of whom self-reported being 20 or younger at the time of the crime, *Firearm Use by Offenders*, U.S. Dept. of Justice Bureau of Justice Statistics Special Report (Feb. 2002) (MTD, Ex. B). MTD 15-16.

Setting aside the inherently dubious value of such outdated material, this proffer starkly illustrates the spurious and self-defeating nature of Defendants' claims. The very survey of prisoners on which they rely shows that, in 1998, around the same time period of the survey, a total of "195,000 persons were arrested by State or local law enforcement or referred to a U.S. attorney for prosecution for a weapon offense"—that is, for *all* crimes involving *any* weapon, not just homicides and not just firearms. MTD, Ex. B at 5. According to the United States Census from this time period, in the year 2000, the total population of 18-to-24-year-olds in this country was 27,143,454, the total population of 15-to-19-year-olds was 20,219,890, and the total population of 20-to-24-year-olds was 18,964,001. United States Census Bureau, *Population by Sex and Selected*

*Age Groups: 2000 and 2010*, Tables 1 & 2; https://www.census.gov/prod/cen2010/briefs/c2010br-03.pdf. Although the census data does not provide the specific population numbers of 18-to-20-year-olds, even if one conservatively estimates a total population of 16,000,000 to 17,000,000 for this group, that would mean the *total* number of people arrested in 1998 for *all* weapons-related crimes would constitute approximately 0.012% to 0.011% of the entire population. And, according to Defendants' own data, *18-to-20-year-old* individuals made up just 22% of *the portion* of this miniscule percentage of all those who were arrested *for homicides* around this time.

Similarly, Defendants' prisoner survey states that the statistical analysis was based on questions posed to 14,285 state prisoners and 4,041 federal prisoners, who responded at a rate of 92.5% (roughly 13,213 respondents) and 90.2% (roughly 3,644 respondents) respectively, MTD, Ex. B at 13, for a total of about 16,857 participants. Thus, all this survey ultimately shows is that some unspecified "portion" of 4,690 (35.5%) state prisoners and 838 (23%) federal prisoners self-reported having been armed and 20 years of age or younger at the time of their offenses. Obviously, such figures are infinitesimally small in light of the prevailing population census—far less even than the portion of the 0.01% of such individuals arrested for homicides during this period.

In fact, the *Hirschfeld* case analyzed similar statistics for the present day and concluded that "while 18- to 20-year-olds may commit a disproportionate share of violent crime, an exceedingly small percentage, around 0.3% and definitely less than 1%, of the 13 million young adults in this group commit those crimes." *Hirschfeld*, 5 F.4th at 444-45 & n. 66 ("the sources consistently show that less than 1% of this age group is arrested for committing a violent crime each year"). Recent FBI crime data show 32,199 arrests of 18-to-20-year-olds in 2019, United States Department of Justice, Federal Bureau of Investigation, *2019 Crime in the United States*,

18

https://bit.ly/3logBfv, compared to a total population of 12,855,949, Annual Estimates of the Resident Population, U.S. Census Bureau, https://bit.ly/3krgpL7. That equates to *a mere 0.25%*.

And the fundamental flaw in Defendants' failed efforts here is that the relevant comparison for purposes of staking out an "important" government interest in advancing "public safety and crime reduction" cannot be based on the number or percentage of 18-to-20-year-olds within the group of *criminal offenders or convicts*, for this entirely ignores the impact on the vast majority of those whose rights are restrained under the challenged laws—all those *law-abiding* 18-to-20-year-olds. Because "very few members of that group" commit *any* crime at all, the mere fact that this age group may perpetrate more of the crime *that is committed* necessarily makes any "correlation between age and gun crimes" "an unduly tenuous 'fit.'" *Hirschfeld*, 5 F.4th at 443 (quoting *Craig v. Boren*, 429 U.S. 190, 201-02 (1976)). As the *Hirschfeld* court emphasized, in the *Craig* case, the Supreme Court flatly rejected Oklahoma's attempt to justify its prohibition against the sale or giving of low-alcohol beer to men ages 18 to 20 with evidence that "2% of males had been arrested for drunk driving." *Id.* at 444-44. While the state's evidence showed that 18-to-20-year-old males "were disproportionately arrested for, killed by, and injured by drunk driving," the Supreme Court held that a mere 2% correlation between "maleness" and drunk driving "must be considered an unduly tenuous 'fit,'" and thus such a justification could not represent "a legitimate, accurate proxy for the regulation of drinking and driving." *Craig* at 203-04. "[J]ust as sex was a poor proxy for drunk driving in *Craig*, age is a poor proxy for gun violence in this case." *Hirschfeld* at 443.

As *Craig* illustrates, "[t]he question is not about the disparity between groups or the total crime each group commits, but the percentage of the group that uses a gun in an impermissible manner. *That* statistic gives us some insight into the likelihood that any one person in the group will use a gun improperly and pose a danger to the public." *Hirschfeld*, 5 F.4th at 446 (italics

19

added). "The rights of more than 99% of a group cannot be restricted because a fraction of 1% commit a disproportionate amount of violent crime." *Id.* "For reducing gun violence and crime, restricting a whole group that is almost entirely law-abiding is the definition of an unduly tenuous fit." *Id.* As a matter of statistics, of the men who commit crime, substantially more do so than women who commit crimes, and of the African American people who commit crime, substantially more do so than their White counterparts. *See e.g.*, United States Department of Justice, Federal Bureau of Investigation, *2019 Crime in the United States*, https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-u.s.-2019/tables/expanded-homicide-data-table-2.xls. Clearly, that such groups are statistically responsible for a relatively *disproportionate* number of crimes is no legitimate basis for imposing a general ban on their rights secured under the Second Amendment. No one would dispute this when it comes to any other constitutional right, and it should be no different when it comes to the Second Amendment, for it is no "second-class" right. *See McDonald*, 561 U.S. at 799 (Scalia, J., concurring) (rejecting Justice Stevens' suggestion that "the Second Amendment right is not fundamental because it is 'different in kind' from other rights we have recognized" as individual rights, and emphasizing that the right is in fact "is deeply grounded in our Nation's history and tradition" based on its important role during the country's founding).

Moreover, *even entertaining* such a flawed comparative analysis simply further undermines the existence of a legitimate state interest in reducing crime. The current data on nationwide crime over the last four years show, consistently, that a *smaller* or, at most, an *equal*, number of 18-to-20-year-olds have been arrested for criminal activities in comparison to those 21 or older. *See* United States Department of Justice, Federal Bureau of Investigation, *2016 Crime in the United States*, https://ucr.fbi.gov/crime-in-the-u.s/2016/crime-in-the-u.s.-2016/topic-pages/tables/table-20 (percentage of 21-year-olds arrested in 2016 was the same as that of 20- and

19- year-olds, and higher than that of 18-year-olds); *2017 Crime in the United States*, https://ucr.fbi.gov/crime-in-the-u.s/2017/crime-in-the-u.s.-2017/topic-pages/tables/table-38 (same in 2017); *2018 Crime in the United States*, https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/topic-pages/tables/table-38 (percentage of 21-year-olds arrested was higher than that of 18-, 19-, and 20- year-olds); *2019 Crime in the United States* https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-u.s.-2019/topic-pages/tables/table-38 (same in 2019).

### 2. Defendants' Specious Attempts to Portray Their Prohibitions as Imposing a "Limited" Burden Further Highlight the Severity of the Actual Impact

The second prong of Defendants' strategy, resting on the notion that the challenged laws impose a "limited" burden because "several carveouts … allow 18-to-20-year-olds to possess and use firearms," MTD 5, 14, is equally specious. Defendants' own characterization of the laws' impact belie this claim since they ultimately admit that the impact is a general ban on carrying loaded firearms anywhere "on public streets and property." MTD 9-10. As the Supreme Court has instructed, at the core of the Second Amendment is the right to keep and bear arms to ensure one's ability "wear, bear, or carry ... upon the person or in the clothing or in a pocket, for the purpose ... of being armed and ready for offensive or defensive action in a case of conflict with another person." *Heller*, 554 U.S. at 584. Of course, the risk of such conflict commonly, if not most often, exists in public. Limiting instances of lawful carrying of a loaded firearm to hunting, fishing, camping, sport shooting, and protecting livestock, and to the confines of one's car, boat, or home, cuts off the ability to exercise this core right secured as a guarantee under the Second Amendment for everyone 18-to-20-years-old, except the comparative few with direct ties to the military.

Defendants misleadingly portray the statutory scheme as creating "*broad exceptions*" for everyone in the State to "carry or possess a firearm" for purposes of "self-defense," "defense of others," "defense of property," and to "prevent a criminal offense from occurring." MTD 4-5, 9

(citing Tenn. Code. Ann. § 39-17-1322). As the plain language of section 39-17-1322 makes clear, no *affirmative statutory right* to carry a loaded firearm in public for these purposes exists, as Defendants claim. Rather, these are merely *defenses to a prosecution* for violating the prohibition. As the provision states, "[a] person *shall not be charged with or convicted of* a violation under this part if the person possessed, displayed or employed a handgun in justifiable self-defense or in justifiable defense of another during the commission of a crime in which that person or the other person defended was a victim." § 39-17-1322(a) (italics added). Nothing prevents a person otherwise prohibited from carrying a loaded handgun in public from being *arrested* for engaging in such conduct and then *bearing the burden to prove* she possessed the firearm for one of the enumerated purposes in order to *avoid* being charged and convicted. That is the very nature of a *defense* to prosecution which necessarily rests on facts that the defendant herself must demonstrate in order claim the privilege. *See* Tenn. Ann. §§ 39-11-203–204; *Terrell v. State*, 361 S.W.2d 489, 492 ("where a negation is peculiarly within the knowledge of the defendant, the burden is on him to establish that fact. Thus, where a charge is made that the defendant carried on a certain business without a license, the fact that he has a license is peculiarly within his knowledge and he must establish that fact or suffer conviction."); *accord State v. McLerran*, 604 S.W.2d 841, 845 (1980).

Moreover, the very fact that the scheme must expressly establish a *defense* to prosecution for lawful acts of self-defense, defense of others, and defense of property highlights the *presumptively unlawful* nature of such conduct for 18-to-20-year-olds and how they are specifically constrained from exercising the core rights of the Second Amendment. That the most the State provides is a *defense* to prosecution *only while actually engaging in lawful defensive acts* shows that the possession of a loaded handgun in public is *illegal* every second of every minute the person possesses one *even if* she is carrying it for the specific purposes of being prepared for

22

lawful defensive actions, because she is afforded no protection for any moment in time *before or after* she actually wields the arm for such a purpose. Thus, while Defendants portray the scheme as preserving the ability of 18-to-20-year-olds to carry loaded firearms in public "for the purpose ... of being armed and ready for offensive or defensive action in a case of conflict," as the Second Amendment guarantees, it effectively bars them from doing so at all. Absent some sort of divine intervention that would place the firearm in their possession *only* at the time of the defensive act and then make it magically disappear immediately after the threat has dissipated, these individuals would necessarily violate the prohibition by simply *attempting to* carry the arm for such purposes. Ultimately then, the sole avenue that the scheme *purportedly* creates for 18-to-20-year-olds to engage in lawful defensive acts with loaded firearms in public is illusory. And the "temporary" nature of this ban, MTD at 14, is no recompense for this *three-year* prohibition that strips of them of their right to go "armed and ready for offensive or defensive action" in public. That a person will be able to protect herself with a handgun three years from now is a useless and cold comfort when she cannot lawfully protect herself or others with a handgun from an imminent threat today.

What's more, while representing a miniscule portion of the total population who *commit* violent crimes, those in this age group represent the largest portion of *victims* of such crimes. Generally, "[t]he victimization rate increases through the teenage years, crests at around age 20, and steadily decreases through the remaining years." *Age Patterns of Victims of Serious Violent Crime*, USDOJ, Bureau of Justice Statistics, Special Report (July 1997), https://bjs.ojp.gov/content/pub/pdf/apvsvc.pdf, at p. 1. "For 1992-94, the rate of serious violent crime ranged from 37 per 1,000 persons age 12 to 14, to 50 per 1,000 persons age 18 to 21, to 3 violent crimes per 1,000 persons age 65 or older." *Id.* at 3-4. Consistent with this pattern, in both 2018 and 2019, those between 18 and 24 fell victim to violent crime far more often than those

between the ages of 25 and 34. *Criminal Victimization*, USDOJ, Bureau of Justice Statistics (Sept. 2020), https://bjs.ojp.gov/content/pub/pdf/cv19.pdf (35.9% versus 31.8% in 2018 and 37.2% versus 25.0% in 2019); *see also Hirschfeld*, 5 F.4th at 446 ("those who are young are also disproportionately the victims of crime"). Thus, the severity of barring them from exercising the core Second Amendment right to lawful self-defense is especially acute—particularly outside the home in public. *See Criminal Victimization in the United States*, USDOJ, Bureau of Justice Statisticsa, 2008 Statistical Tables, tbl. 61, (2010), https://bit.ly/3sl6490 (18.4% of violent crimes occur at or in the victim's home, while 26.5% occur on the street or in a parking lot or garage).

## VI.  The Failure of Required Tailoring is Monumental

Nailing the coffin on Defendants' failed strategy is the reality that they have made no effort to show this ban on 18-to-20-year-olds has advanced or will advance in any material way the generic interests in "public safety and crime reduction." "It is not enough to target guns generally and argue that less access to guns means less crime, as this would justify almost any restriction and eviscerate the Second Amendment." *Hirschfeld*, 5 F.4th at 447. "[M]ere anecdote and supposition" don't suffice; nor, obviously, can flawed comparative analyses comprised of data that only *undermine* their claims suffice to *prove* the scope of the ban "is *in proportion* to the interest served." *Id. Stimmel*, 879 F.3d at 207. And in fact, to the contrary, "[o]fficial data from numerous states indicates that shall-issue permit holders are *unusually law-abiding* compared to the population as a whole and do not commit a significant proportion of violent crimes committed with guns." Michael P. O'Shea, *The Steepness of the Slippery Slope: Second Amendment Litigation in the Lower Federal Courts and What It Has to Do with Background Recordkeeping Legislation*, 46 Conn. L. Rev. 1381, 1433 & n.259 (2014) (italics added). The substantially less-restrictive alternative of allowing *licensed* 18-to-20-year-olds to carry further undermines any claimed public

24

safety justification here. Even under intermediate scrutiny, a state cannot justify a flat ban when it has not "seriously undertook to address the problem with less intrusive tools readily available to it" or, at a minimum, rejected such alternatives for good reason. *See McCullen v. Coakley*, 573 U.S. 464, 494 (2014); *Bruni v. City of Pittsburgh*, 824 F.3d 353, 367 (3d Cir. 2016).

Ultimately, "[t]o justify this restriction, [Tennessee has] used disproportionate crime rates to craft overinclusive laws that restrict the rights of overwhelmingly law-abiding citizens." *Hirschfeld*, 5 F.4th at 410. However, under the dictates of *Heller*, the State "may not restrict the rights of an entire group of law-abiding adults because a minuscule portion of that group commits a disproportionate amount of gun violence." *Id.* at 452. "Despite the weighty interest in reducing crime and violence" that Defendants claim to pursue, we must "refuse to relegate either the Second Amendment or 18- to 20-year-olds to a second-class status." *Id.* at 410.

The Motion to Dismiss must be denied.

This the 13th day of September, 2021.

*/s/ Jay L. Johnson*

Jay L. Johnson

Raymond M. DiGuiseppe*

TN Bar No. 020155

The DiGuiseppe Law Firm, P.C.

JOHNSON LAW FIRM

4320 Southport-Supply Road, Suite 300

105 Crook Avenue

Southport, NC 28461

PO Box 97

P: 910-713-8804

Henderson, TN 38340

E: law.rmd@gmail.com

P: 731-989-2608

*Admitted Pro Hac Vice*

E: jay@jayjohnsonlawfirm.com

William Sack*

FIREARMS POLICY COALITION

1215 K Street, 17th Floor

Sacramento, CA 95814

(916) 596-3492

E: wsack@fpclaw.org

*Admitted Pro Hac Vice*

*Attorneys for Plaintiffs*

25